**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MISS SWISS, LLC | : | CIVIL ACTION NO. 21-5582 |
| | : | |
| *Plaintiff*, | : | |
| v. | : | |
| | : | |
| LMT MERCER, GROUP INC. | : | JURY TRIAL DEMANDED |
| | : | |
| *Defendant*. | : | |
| | : | |

## AMENDED COMPLAINT

Plaintiff, Miss Swiss, LLC, by and through its undersigned counsel, the Jacobs Law Group PC, hereby brings this action against Defendant LMT Mercer Group, Inc. and in support thereof avers as follows:

## NATURE OF THE COMPLAINT

1.      This is an action for breach of contract, breach of warranty, intentional misrepresentation, and negligent misrepresentation, in connection with defective goods provided by the Defendant to Plaintiff and the parties attendant business relationship. The damage to Plaintiff has been extensive and far-reaching. In every step of the parties' business and contractual relationship, Defendant has failed to perform in accordance with its legal and contractual obligations and duties.

2.      On September 3, 2020. Plaintiff sent a Purchase Order to Defendant for the production of 31,075 GGM Cases at a cost of $134,224 to Plaintiff. Despite this contractual and legal obligation, and as a result of substantial manufacturing and assembly defects that Defendant continuously promised to resolve but did not, Plaintiff was not provided a single GGM Case that was salable to the public at the time of delivery. Of the defective GGM Cases provided by

1

Defendant, a mere 2,232 cases were able to be made salable to the public by Plaintiff, but only after a third-party company dissembled the GGM Cases provided by Defendant and reproduced them using salvageable parts. Furthermore, Defendant never completed the Purchase Order, shorting Plaintiff 469 GGM Cases, and provided Plaintiff with the incorrect quantities of colors called for in the Purchase Order, all without Plaintiff's knowledge or consent.

3.      Plaintiff also paid Defendant $42,000 for the production of two injection molds of its GGM Case and paid an additional $10,500 for expedited delivery and air shipment of the injection molds ("GGM Molds"). This was done to ensure Miss Swiss would have salable GGM Cases from Defendant in advance of the lucrative 2020 holiday season. Defendant, however, failed to timely deliver the GGM Molds, causing significant delays to production of GGM Cases. Prior to the GGM Molds being finalized, Plaintiff approved a sample manufactured at Defendant's Chinese manufacturing facility using the injection molds Defendant allegedly shipped to its United States facilities for production of GGM Cases at scale. All but 2,232 GGM cases produced by Defendant in connection with the Purchase Order, however, were defective as they were out of conformance and compliance with the approved sample from China.

4.      Plaintiff paid Defendant at least $190,724 for the production of the GGM Molds and 31,075 salable GGM Cases. In return, Plaintiff was provided the GGM Molds late, which required substantial revisions, and only 2,232 salable GGM Cases. Defendant's failure to meet its contractual and legal obligations has damaged Miss Swiss in an amount in excess of $300,000.

5.      Defendant further engaged in a pattern of misconduct to disguise its inabilities and/or refusals to meet its contractual and legal obligations, and to induce Miss Swiss to continue its business relationship with Defendant, by exaggerating its capability to manufacture the GGM Molds and produce salable GGM Cases.

6.      Defendant LMT consistently represented to Plaintiff Miss Swiss that it could and

would make the necessary and appropriate modifications to the GGM Molds and its assembly protocols to enable LMT to manufacture, assemble, and produce GGM Cases that were in conformance with the approved sample from China and salable to the public.

7.      During the time period Defendant was producing and supplying GGM Cases to Plaintiff, Defendant repeatedly promised that it could and would correct and rectify its manufacturing and assembly issues, but ultimately failed to do so.

8.      The damage to Plaintiff, a small start-up company, because of Defendant's willful and/or negligent conduct in failing to fulfill its legal and contractual obligations has been extreme. Plaintiff's GGM Cases are its highest grossing and most important product for which a patent is pending. Defendant's consistent and repeated failures to provide salable GGM Cases has caused Plaintiff to be delayed in fulfilling product orders, unable to follow up on retailer interest in subsequent orders, unable to capture sales during the lucrative 2020 holiday season, and unable to take full advantage of its patent protection. The damage to Plaintiff continues to this day.

9.      Moreover, manufacturing and assembly costs have risen dramatically since the date Defendant was contractually required to supply the 31,075 GGM Cases in connection with the Purchase Order.

10.     Plaintiff has also incurred additional costs, expenses, and damages due to Defendant's failures to comply with its legal and contractual obligations and duties in the form of wasted assembly parts (purchased by Plaintiff), the replacement value of nonsalable goods, costs and time spent by Plaintiff inspecting defective cases and quality control, costs and time spent making adjustments to unsalable cases (done at Plaintiff's own expense), and significant damage to Plaintiff associated with being denied the ability to have a salable product. Plaintiff has had to cancel several purchase orders and contracts with third-party sellers as a result of Defendant's failure to supply it with salable product. Plaintiff has further expended in excess of $92,000 on

advertising and marketing related to GGM Cases that has been wasted due to the failure of Defendant to provide a salable product.

11.     Simply put, Defendant manufactured, assembled, and sold GGM Cases and GGM Molds that were defective and unsuitable for use by Plaintiff, routinely misrepresented to Plaintiff its ability to manufacture the GGM Molds and produce salable GGM Cases, and sought to deceive Plaintiff into continuing its business relationship. As a result of Defendants' malfeasance, Plaintiff has suffered damages in excess of $300,000.

## PARTIES

12.     Plaintiff Miss Swiss, LLC ("Plaintiff" or "Miss Swiss") is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania, with its company headquarters located at 15 South Main Street, Hatfield Pennsylvania 19440.

13.     Plaintiff is in the business of, among other things, manufacturing cosmetic products and cosmetic cases.

14.     Defendant LMT Mercer Group, Inc. ("Defendant" or "LMT") is believed to be a corporation organized and existing under the laws of the State of New Jersey, with its company headquarters located at 690 Puritan Avenue, Lawrenceville New Jersey 08648.

15.     Defendant is a sophisticated merchant engaged in the business of, among other things, manufacturing, assembling, and producing plastic injection molds and plastic products.

16.     It is believed that LMT operates plastic manufacturing and assembly facilities in China and in the United States in the State of New Jersey and the State of Ohio.

## JURISDICTION AND VENUE

17.     This Honorable Court has diversity jurisdiction to adjudicate this matter pursuant to 28 U.S.C. § 1332.

18.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(a) as this is the judicial district in which a substantial part of the events giving rise to the claims occurred.

## FACTS

## MISS SWISS BEAUTY BRAND AND ITS GLAMOUR ON THE GO MAKEUP CASES

19.     Plaintiff, Miss Swiss, is a beauty brand and company engaged in the business of designing, selling, and manufacturing innovative beauty products, including travel beauty products.

20.     Miss Swiss launched its brand and company with its travel make-up case: the Glamour on the Go Makeup Case ("GGM Case").

21.     The GGM Case is a plastic makeup case that contains four staggered plastic makeup holders secured on an axis which enables the user to pivot one holder at a time to apply the beauty product, while keeping the remaining three products stored in the case. The four hinged makeup holders are connected to the plastic case frame using metal screws and locknuts. The GGM Case is fully enclosed with three plastic frame components: a combined bottom and back side piece, a front side piece, and a cover lid—the front side piece is joined to the combination bottom and back side piece using metal machine screws and locknuts and the cover lid is joined to the combination piece using an acrylic rod. The GGM Case contains a plastic latch that prevents unwanted opening of the case. The GGM Case further contains a mirror on the inside of the cover.



22.     Miss Swiss' GGM Case allows users to easily apply makeup "on-the-go" while at the same time securely storing and organizing makeup during travel.

23.     When properly manufactured and assembled, Miss Swiss' GGM Cases are designed to permit the user easily and precisely apply cosmetic products while "on the go" and without damaging the product.

24.     More particularly, Miss Swiss' GGM Case derives its patented value from its ability to hold up to four different beauty products (*i.e.* lipstick, eyeliner, etc.) with  secure plastic holders that allow the user to move/swivel each individual makeup holder independently of the others. In addition, Miss Swiss specifically designed its GGM Cases to securely store the makeup holders, and the make-up products, during transit and without damage to the beauty productions therein. Each of these specific GGM Case design features is intended to permit the user to use the case precisely in this fashion.

25.     Miss Swiss' GGM Case is made of plastic components which are assembled using metal machine screws and locknuts and acrylic pins.

26.     The GGM Cases, specifically the injection molds they are manufactured from, are designed using computer-aided design (CAD) drawings ("Mold Drawings").

27.     Although Miss Swiss designs and sells numerous other beauty products, its GGMCases account for a substantial portion of its overall business.

**Miss Swiss Informs LMT of the Specific Purpose**

28.     In or around June 2020, Miss Swiss desired to enter into a contractual relationship with a manufacturer of plastic products to begin production of its GGM Cases.

29.     Between June and July 2020, Miss Swiss and LMT discussed LMT's ability to create the GGM Molds and manufacture, assemble, produce, and package the GGM Cases for Miss Swiss.

30.     By way of example only, and as more fully described below at Paragraphs 31, 32, 52, 75, 78, 80, 96, 104, and 140, on numerous occasions Miss Swiss articulated to LMT the specific purpose of the GGM Case, and what provides the GGM Case its patented value: (1) to allow the user to swivel each individual make-up holder independently of the others; (2) the make-up holders must be attached to their axes securely to allow each holder to remain in position during application; (3) the makeup-holders must be securely fastened to their axes and spaced appropriately such that the beauty products will not be damaged due to friction or the products damaging each other during transit; and (4) the GGM case must securely store the make-up holders, and prevent damage to the beauty products contained therein, while the user in "on the go".

31.     Specifically, on June 11, 2020, prior to any contractual relationship between the parties, Miss Swiss informed LMT that the "major purposes" of its GGM Case is "to prevent makeup spillage due to friction (of the lids against other makeup or other items inside of a purse) and to allow the user to put their makeup on easily on the go." *See* Exhibit M.

32.     Furthermore, LMT was provided with initial copies of CAD files indicating the specific design dimensions, attributes, and features of the GGM Case.

33.     By way of example only, and as more fully described below at Paragraphs 39, 40, 77, 79, 81, 88, 96, 97, 105, 110, 131, 132, 136, and 145, on numerous occasions LMT represented and made clear to Miss Swiss, and Miss Swiss relied thereon, that it could design the GGM Molds and properly manufacture, produce, assemble, and package the GGM Cases in accordance with Miss Swiss' expressly stated purposes and the specific design features.

34.     It is with this full knowledge of these specific purposes and design attributes, that LMT entered into a business relationship with Miss Swiss to design the GGM Molds and the manufacture, assembly, production, and packaging of the GGM Cases.

**Based on LMT's Representations, Miss Swiss Engages LMT Mercer Group to
Produce And Deliver Injection Molds**

35.     On or around July 16, 2020, Miss Swiss received a quote from LMT for the creation the two GGM Molds (and the Mold Drawings), along with plastic and assembly costs. Included in this quote, LMT provided a timeline of 12-14 weeks from LMT's receipt of funds for production of the GGM Molds.

36.     On or around July 17, 2020, Miss Swiss paid LMT $42,000 for LMT to produce the two GGM Molds of Miss Swiss' GGM Case. *See* July 17, 2020 Wire Transfer, attached heretoas Exhibit B.

37.     LMT does not produce molds in the United States. Rather, it produces them at a Chinese facility utilized by LMT. The molds are then shipped from this Chinese facility to the United States.

38.     On or around July 17, 2020, LMT assigned a product engineer, Richard Himmelreich, to facilitate the creation of the GGM Molds and to move the production process for the GGM Cases forward.

39.     Mr. Himmelreich advised Miss Swiss that it was required to make alterations to the Mold Drawings before LMT could proceed with production of the GGM Molds and to allow LMT to produce GGM Cases in accordance with Miss Swiss' stated specifications.

40.     Mr. Himmelreich presented Miss Swiss with LMT's suggested alterations to the Mold

Drawings in order to achieve the GGM Cases intended purpose.

41.     Miss Swiss requested that LMT make the alterations proposed by Mr. Himmelreich to the Mold Drawings.

### Miss Swiss Engages LMT to Manufacture and Assemble GGM Cases

42.     Based on LMT's representations that it would be able to deliver injection molds for its GGM Case within 12-14 weeks of July 17, 2020 (the date Miss Swiss paid LMT), Miss Swiss sent LMT a Purchase Order on September 3, 2020. *See* September 3, 2020 Purchase Order attached hereto as Exhibit A.

43.     Pursuant to the Purchase Order, LMT was to manufacture, assemble, and produce 31,075 GGM Cases at a cost of $134,224 to Miss Swiss and in the following colors: 8,515 black, 6,590 blue, 6,590 pink, 5,265 purple, and 4,115 yellow. *See* Exhibit A.

44.     As required by Defendant LMT, Miss Swiss prepaid the entirety of the Purchase Order ($134,224) that same date, July 17, 2020.

45.     As part of its $134,224 payment to LMT on July 17, 2020, Miss Swiss paid $85,767 to LMT to manufacture the GGM Case's plastic pieces ($2.76/case) and paid LMT $48,477 to assemble the plastic pieces into salable GGM Cases ($1.56/case).

46.     Notably, other than inquiring about sourcing assembly parts and quantity, LMT never indicated or inquired into any other factors (design or otherwise) that would impact LMT'sability to properly manufacture and assemble the GGM Cases called for in the Purchase Order.

### LMT Provides a Defective Sample Initially, Miss Swiss Approves Second Sample

47.     Pursuant to LMT's timeline provided on July 16, 2020, Miss Swiss was led to believe that LMT would provide it with usable and quality injection molds within 12-14 weeks.

48.     As part of the molding process, Miss Swiss was to review samples of GGM Cases manufactured pursuant to a proposed mold design produced by LMT.

49.     On or around September 28, 2020, LMT delivered to Miss Swiss, the first GGM Case

sample.

50.     Upon inspection of the first GGM Case sample delivered by LMT, Miss Swiss discovered issues and defects. Specifically, this sample had acrylic hinge pins that did not fit the pin slots they were intended for, and the plastic latch was defective to such a degree that Miss Swiss could not properly test the cover lid and latch—the latch further did not properly keep the case closed.

51.     Indeed, LMT itself admitted that this sample contained an "imperfection".

52.     On or about September 29, 2020, Miss Swiss communicated these issues with this first GGM Case sample to LMT.

53.     As a result of the issues and defects in the first GGM Case sample, the following changes were made by LMT: (1) the latch nub was extended; and (2) the hinge pin slot diameter was increased.

54.     On or around October 22, 2020, LMT delivered to Miss Swiss a second GGM Case sample.

55.     This second sample delivered on October 22, 2020, was manufactured at the Chinese facility, not in the United States.

56.     Notably absent from this Chinese sample provided to Miss Swiss was any issue with screw tightness.

57.     On October 23, 2020, Miss Swiss communicated to LMT its approval of the GGM Case sample delivered on October 22, 2020 (hereinafter "Approved Sample") and requested that LMT proceed with production of GGM Molds and GGM Cases based on this Approved Sample.

### LMT Fails to Timely Deliver the GGM Case Injection Molds and Miss Swiss Provides LMT with Assembly Parts

58.     In early November, LMT represented to Miss Swiss that it had completed production of the GGM Molds.

59.     On November 3, 2020, Miss Swiss provided assembly parts to LMT for it to assemble and package the GGM Cases. Miss Swiss provided the assembly parts and packaging to LMT at its own expense, and at a cost of $46,951.52.

60.      With the expectation that LMT would perform under the Purchase Order and provide GGM Cases that were free of defects and salable to the public, Miss Swiss purchased additional packaging materials to ensure the cases remained safe during shipping to customer at acost to Miss Swiss of $10,797.

61.      On or around November 5, 2020, LMT represented to Miss Swiss that it would have difficulties shipping the GGM Molds from its Chinese facilities to the United States. To reduce the delay in delivery, LMT quoted Miss Swiss an option to expedite delivery of the molds by paying for air shipment. Specifically, LMT represented to Miss Swiss that for an additional cost of $10,500 it could deliver the GGM Molds by November 20, 2020.

62.      Conversely, LMT stated that if Miss Swiss elected not to pursue the expedited air shipment, the GGM Molds would be shipped on either November 14th or November 21, with a delivery date of mid-December.

63.      Both of these delivery dates, November 20, 2020, and mid-December are past Miss Swiss' expected date of delivery of the GGM Molds based on the timeline provided by LMT of 9-11 weeks from receipt of payment (June 16, 2020).

64.      Hoping to take advantage of the lucrative 2020 retail holiday season, Miss Swiss paid LMT an additional $10,500 based on LMT's representation that the GGM Case injection molds would be delivered by November 20, 2020.

65.      On November 6, 2020, LMT confirmed that it was air shipping the GGM Molds and represented that it was ready to begin production of GGM Cases, at scale, at its New Jersey facility once the molds were received from China.

66.      On November 9, 2020, LMT asked Miss Swiss to deliver a correctly and fully assembled prototype GGM Case for reference during assembly once LMT received the molds from China and began to produce the plastic parts. Miss Swiss complied and provided LMT witha correctly and fully assembled prototype GGM Case.

67.     On November 10, 2020, LMT confirmed to Miss Swiss that delivery of the GGM Case injection molds was "still on track" for November 20, 2020, and that LMT had received thefully assembled GGM Case from Miss Swiss. *See* November 10, 2020 Email from Richard Himmelreich, attached hereto as Exhibit C.

68.     On November 13, twenty days after the Approved Sample was approved and finalized by Miss Swiss, and seven days prior to the expected date  of delivery, LMT advised Miss Swiss that its Chinese facility discovered additional quality issues in the molds and that the molds failed to meet LMT's quality inspection standards. As a result of these newly discovered defects, LMT stated that it would need to delay shipment of the GGM Molds until November 19, 2020, and that the molds would not be delivered to its New Jersey facility under  thefollowing week, after its November 20, 2020, delivery date.

69.     Because of LMT's delays in shipping the injection molds, on November 13, 2020, LMT further advised Miss Swiss that December 7, 2020, would be the earliest expected date thatit could begin production on the Purchase Order.

70.     On November 19, 2020, LMT advised Miss Swiss that the molds were shipped from China, scheduled to arrive at the John F. Kennedy International Airport by November 23, 2020, and expected to  be delivered to LMT's  New Jersey  facility  by  November 25,  2020, (five days late).

71.     On November 23, 2020, LMT advised Miss Swiss of further delays in shipment of the GGM Molds to its New Jersey facility. LMT stated that the molds would now be arriving at John F. Kennedy International Airport on November 25, 2020 and expected to be delivered to LMT's New Jersey facility on November 30, 2020 (ten days late).

72.      As a result of LMT's failure to timely deliver the GGM Molds to its New Jersey facility and begin manufacturing of the Purchase Order caused Miss Swiss to be unable to sell three out of the five colors called for in the Purchase Order (blue, purple, and yellow) during the lucrative 2020 holiday season.

73.     Additionally, as a result of its failure to timely deliver the GGM Molds and begin

12

manufacturing of the Purchase Order, LMT was only able to produce and make available to Miss Swiss 1,368 cases (684 black and 684 pink) prior to the 2020 holidays. However, each and every one of these 1,368 black and pink GGM Cases were defective and needed to be reassembled by Plaintiff (and at Plaintiff's own expense) in order to make them salable.

74.     LMT caused Miss Swiss to pay $10,500 in expedited delivery charges that were neither necessary nor honored by LMT.

75.     Furthermore, LMT provided Miss Swiss with defective GGM Molds that needed the following changes: (1) the latch nub was extended; and (2) the hinge pin slot diameter was increased; (3) the latch nub was extended further and a notch was added for the hinge pins; (4) nubs were added to the lid to keep it closed; (5) the holder nubs were deepened to help assembly tightness; and (6) the holder nubs were shorted and front bosses were extended to engage the latch.

76.     Each of the above listed issues, defects, and required changes were a result of the manufacturing and/or assembly issues on the part of LMT.

### LMT Develops Assembly Instructions for GGM Cases and Miss Swiss Provides Assemble Materials

77.     As part of the Purchase Order, LMT was required to provide fully assembled GGM Cases, not just manufacture the plastic components of the cases. As such, LMT developed assembly instructions for its New Jersey facility to assemble and complete production of fully functional GGM Cases.

78.     On November 6, 2020, Miss Swiss stressed to LMT that proper tightness of the screws connecting the four hinged makeup holders to the case frame was of the utmost importance.

79.     With full knowledge of its specific purpose and intended use, LMT developed assembly instructions for the GGM Case and delivered them to Miss Swiss on November 19, 2020.

80.     That same day, Miss Swiss agreed to LMT's assembly instruction but again emphasized, as it had before contracting with LMT, that the instructions need to consider a specific purpose of the GGM Case: that only one of the four makeup holders should swivel at a time in the GGM Case. Miss Swiss again

13

indicated to LMT that the GGM Case must be assembled in such a way to permit this. Miss Swiss also again emphasized the importance of the tightness of the screws for the makeup holders during assembly. If the makeup holders are not properly assembled, the specific function of the GGM Case is lost.

81.     LMT responded by ensuring Miss Swiss that it understood the importance of screw tightness during assembly. LMT did not indicate that achieving the correct tightness would be an issue.

82.     On December 4, 2020, Miss Swiss delivered the assembly materials (*i.e.* pins, screws, mirrors, locknuts, stickers, packaging, etc.) to LMT's New Jersey facility.

**LMT's New Jersey Facility Receives the GGM Case Molds from China, Begins Production of GGM Cases, and Fails to Timely Produce the First Invoice of GGM Cases**

83.     On December 1, 2020, LMT advised Miss Swiss that the GGM Molds had been received at its New Jersey facility, that they were on track to begin production that week, and that LMT would have some GGM Cases fully completed and ready for pickup by December 4, 2020.

84.     On December 2, 2020, LMT told Miss Swiss that it would sample one of the injection molds (and the other mold would be sampled December 3) and that production of GGM Cases would begin shortly thereafter.

85.     On the morning of December 2, 2020, LMT sent Miss Swiss an invoice for 9,750 GGM Cases (approximately 30% of the 31,075 case Purchase Order) and represented that, once Miss Swiss approved the invoice, it would manufacture as many pink GGM Cases by December 4, 2020, as it could to enable Miss Swiss to meet an outstanding order on time.

86.     Based on LMT's December 1st and 2nd representations that it would be able to begin production on the GGM Cases that week and have at least some of the invoice complete and ready for pickup by December 4, 2020, Miss Swiss agreed to the invoice production of the 9,750 GGM Cases.

87.     Later that afternoon, however, LMT advised Miss Swiss for the first time that they did not know how long it would take to produce and assemble a completed GGM Case.

14

88.     Also on December 2, 2020, LMT provided Miss Swiss with a sample GGM Case which was produced using the just delivered GGM Molds. Both Miss Swiss and LMT agreed that there were issues with the cover latch not being in conformance with the Approved Sample. LMT represented that it could quickly make the necessary changes and that with these changes, LMT would be able to manufacture, assemble, and produce GGM Cases that were in conformance with the Approved Sample.

89.     No GGM Cases, however, were ready to be picked up by Miss Swiss by December 4, 2020.

90.     On December 10, 2020 (5 days later), the first batch of GGM Cases were ready for pickup by Miss Swiss at LMT's New Jersey facility: 684 pink and 684 black GGM Cases.

**<u>Miss Swiss Discovers Defects in First Pickup of GGM Cases and Notifies LMT</u>**

91.     During the month of December 2020, LMT manufactured the plastic components for approximately 2/3 of the Purchase Order.

92.     On December 10, 2020, Miss Swiss representatives arrived at LMT's New Jersey facility to pick up 1,368 GGM Cases (648 pink and 684 black).

93.     Upon inspection of these 1,368 GGM Cases, Miss Swiss noticed some defects. These defects included: (1) practically all of the cases had screws and nuts that were not properly tightened because the four make-up holders did not move/swivel independently of one another and securely stay in place (rather they all moved/swiveled simultaneously with each other); and (2) on some cases, the bottom of the case frame was not flush with the case sides, causing the bottom to not be properly attached, pull away, and detract from the stability of the case.

94.     None of these defects were present in the October 22, 2020, Approved Sample, which was accepted by Miss Swiss and manufactured at the Chinese facility. The 1,368 GGM Cases were not of the same quality, and did not function the same, as the October 22, 2020 Approved Sample.

95.     These manufacturing and assembly defects arose only after LMT began production at its New Jersey facility and were the result of defects in LMT's manufacturing and assembly process at its New

Jersey facility.

96.     Miss Swiss specifically requested that these defects be resolved and LMT specifically stated that they were in the "beta phase" so errors were normal. LMT further represented that they would incorporate the concerns raised by Miss Swiss into the molds and its production of further GGM Cases to resolve the defects.

97.     On December 11, 2021, LMT specifically stated that its production and quality assurance teams were aware of the defects and were making the necessary changes to resolve them.

**Subsequent Pickups of GGM Cases from LMT's New Jersey Facility**

98.     On December 18, 21, and 29, 2020, Miss Swiss picked up additional batches of GGM Cases. During these three pickups, Miss Swiss received 8,593 GGM Cases (2292 pink, 2379 black, 1968 purple, 406 blue, 1548 yellow).

99.     Miss Swiss identified defects and assembly issues in each of these pickups. These defects included: (1) practically all of the cases had screws and nuts that were not properly tightened because the four make-up holders did not move/swivel independently of one another and securely stay in place (rather they all moved/swiveled simultaneously with each other); and (2) on some cases, the bottom of the case frame was not flush with the case sides, causing the bottom to not be properly attached, pull away, and detract from the stability of the case.

100.    Miss Swiss identified additional defects in these GGM Cases in that some were missing the mirror on the inside cover of the case entirely or had mirrors installed over the guides built into the frame—which not only impacted the function of GGM Cases but also was a safety concern since such mis-installation of the mirrors increases their proclivity to crack.

101.    Moreover, there were grease stains on the interior of GGM Cases and dirt and markings on the inside of the packaging.

102.    Again, none of these manufacturing and assembly defects were present in the Approved

Sample produced at the Chinese facility and approved by Miss Swiss. All of the defects associated with the GGM Cases were the result of LMT's failure to manufacture and assemble cases that were consistent with the Approved Sample.

103.     None of the defects and assembly issues raised by Miss Swiss on December 2 were addressed by LMT in its production and assembly of the GGM Cases picked up by Miss Swiss on December 18, 21 and 29.

104.     On December 29, 2020, Miss Swiss complained to LMT of the recurring defects and assembly issues in the GGM Cases and the lack of any improvement in production.

105.     LMT represented to Miss Swiss that it would make the appropriate modifications to its manufacturing and assembly protocols so as to enable it to produce GGM Cases that werein conformance with the Approved Sample.

### LMT Makes Changes to the GGM Cases Molds, Miss Swiss Makes an Additional Payment to LMT and LMT Continues to Produce Defective GGM Cases

106.     Despite LMT's continued promises to remedy its failures to produce GGM Cases in conformance with the Approved Sample, LMT did not make any efforts to alter its manufacturing and assembly protocols to address the issues and defects raised by Miss Swiss on numerous occasions until December 30, 2020, and not until all but 9,200 GGM Cases remained of the Purchase Order to be produced by LMT (6,200 blue and 3,000 pink).

107.     LMT produced approximately two-thirds of the Purchase Order  without taking any step to ensure that its manufacturing and assembly protocols produced GGM Cases that conformed to the Approved Sample, were free of defects, and were salable to the public. And the steps taken by LMT, after the fact, were insufficient.

108.     Despite these attempts to rectify its manufacturing and assembly issues, LMT continued to produce defective GGM Cases, at the expense of Miss Swiss.

109.    On January 15, 2021, Miss Swiss picked up 3,651 additional GGM Cases. *See* January 15, 2021 Invoice, attached hereto as Exhibit D.

110.    In these GGM Cases, Miss Swiss discovered the same manufacturing and assembly defects as it had raised on numerous prior occasions and which LMT had promised to rectify, including December 10 and December 29, 2020. These defects included: (1) practically all of the cases had screws and nuts that were not properly tightened because the four make-up holders did not move/swivel independently of one another and securely stay in place (rather they all moved/swiveled simultaneously with each other); (2) on some cases, the bottom of the case frame was not flush with the case sides, causing the bottom to not be properly attached, pull away, and detract from the stability of the case; and (3) on some cases, the inside of the top cover was missing mirrors entirely or had mirrors installed over the guides.

111.    Miss Swiss identified further manufacturing defects in these GGM Cases, including: (1) missing hinge pins; (2) missing color stickers; and (3) the sides of the GGM Cases were not connected to the bottom at all; (4) pieces being assembled upside down; (5) cases stained with grease marks; (6) packaging with stained interiors; and (7) the latch holding the lid cover in place did not match the Approved Sample.

112.    In addition to these defects, LMT continued to produce GGM Cases with defects in the overall stability and tightness of the cases. The GGM Cases Miss Swiss received on January 18, 2021, had incorrect and inconsistent tension for the makeup holders on practically every case.

113.    Each of these defects were a result of LMT's failure to manufacture and assemble GGM Cases in conformance with the Approved Sample.

114.    Miss Swiss notified LMT of each of these additional defects on January 18, 2021.

115.    The GGM Cases supplied from LMT contained the above-described defects in both plastic molding and assembly of the pieces.

116.    Miss Swiss was able to make salable approximately 2,232 GGM Cases by salvaging correct

plastic pieces (molded at various times) and reassembling them using recovered parts (at Miss Swiss' own expense).

117.     The remaining GGM Cases supplied by LMT contained the above-described defects and contained plastic molded pieces that were defective to such a degree that any reassembly could not make them salable.

118.     Miss Swiss was able to make salable approximately 2,232 GGM Cases, but only after a third-party company salvaged plastic pieces manufactured by LMT (from cases manufactured at various times) and reassembled the cases correctly and in such a way that the case conformed with the Approved Sample. Miss Swiss incurred the charges to reassemble these 2,232 GGM Cases at cost of $3.00/case ($6,696).

119.     On January 18, 2021, Miss Swiss performed quality control checks on a small sample of GGM Cases (600 cases) and found substantial assembly defects in that the vast majority of the cases still did not have the correct tensions in the makeup holder screws so as to allow them to swivel correctly on their axis. This defect was compounded by the fact that the makeup holders did not perform in accordance with the Approved Sample in that the holders did not lock or "click" into the closed position. In fact, Miss Swiss itself had to adjust on average 11 out of the 12 hinge screws on each of the thousands of defective cases. Miss Swiss made such adjustments at its own expense.

120.     In addition to the majority of the sample of 600 GGM Cases having incorrect tensions, Miss Swiss identified further defects, including: 5 cases had missing mirrors, 10 cases had bottom frame components that were not attached to the side components, 3 cases were missing hinge pins, and 6 cases were missing color stickers—in total amounting to 4% of the 600-case sample.

121.     Thus, upon inspection of 600 GGM Cases produced by LMT as of January 18, 2021, practically all of them were defective due to the plastic frame and plastic makeup holder being improperly tightened and 24 cases (4%) contained additional manufacturing defects described above.

122.    Miss Swiss performed this quality control inspection at its own expense.

123.    Again, none of these manufacturing or assembly defects were present in the Approved Sample.

124.    Miss Swiss explained to LMT that these defects were expensive to Miss Swiss and required it to hire contractors to inspect each case for defects and reassemble the thousandsof defective GGM Cases produced by LMT.

125.    Miss Swiss further explained, although unnecessarily, that it had obligations to both retailers, suppliers, and its online customers to meet orders and provide quality GGM Cases.

126.    LMT's continued failures to provide salable GGM Cases prohibited Miss Swiss from being able to fully capture the lucrative 2020 holiday season.

127.    On this same date, January 18, 2021, Miss Swiss further stated that it would not accept any GGM Case that was not manufactured as it requested, in conformance with the Approved Sample, and as the case design called for, including properly assembled and tightened cases.

**LMT Confirms its Prior Production was Defective, Again Makes Additional Changes to its Manufacturing and Assembly Protocols, and Continues to Produce Defective GGM Cases**

128.    In response to the complaints made by Miss Swiss on January 18, 2021, the next day, January 19, 2021, LMT admitted that its own employees discovered GGM Cases that were improperly tightened and had loose side frame components.

129.    Despite the numerous complaints by Miss Swiss and promises made by LMT to correct the defects in its production of GGM Cases, LMT told Miss Swiss that it was "still in the startup phase" of its production. However, LMT further stated that, as of January 19, 2021, only 2,400 blue GGM Cases were left to be manufactured of the original 31,075 case Purchase Order.

130.    LMT molded and manufactured 92% of the Purchase Order while "still in the startup phase" and without making the necessary changes to its production to enable it to produce GGM Cases that

were in conformance with the Approved Sample.

131.    Prior to manufacturing the plastic components for the remaining 2,400 blue GGM Cases, LMT requested that Miss Swiss supply it with updated Mold Drawings to load into its manufacturing systems that would seek to alleviate the defects identified by Miss Swiss. Miss Swiss complied and LMT stated it was adjusting its manufacturing protocols accordingly.

132.    LMT further represented to Miss Swiss that it was adjusting its assembly protocols to ensure the appropriate tightness of the case frame and makeup holder screws.

133.    Miss Swiss again complained about issues with the cover of the cases not properly closing.

134.    On January 28, 2021, LMT delivered prototypes of GGM cases that were produced with its newly updated manufacturing and assembly protocols. Miss Swiss advised LMT that the case cover was still not closing and staying closed like the Approved Sample. The prototypes provided on January 28, 2021, by LMT had covers that held open by approximately half an inch and the latch was not in conformance with the Approved Sample.

135.    LMT agreed that additional changes to its manufacturing and assembly protocols were needed and shipped another set of samples to Miss Swiss on January 29, 2021.

136.    Indeed, throughout the time period in question, LMT consistently (and falsely) represented to Miss Swiss that it could and would make the necessary changes to its manufacturing and assembly protocols so as to enable LMT to produce salable GGM Cases that are in conformance with the Approved Sample.

137.    Along with its January 29, 2021, shipment of case samples to Miss Swiss, LMT further admitted on January 29, 2021, that it was experiencing substantial inconsistencies in the tightness of the case frame and makeup holders from one production run the next.

138.    On February 10, 2021, LMT admitted that its modifications to its assembly protocols were done to "reduce chance of error" and asked Miss Swiss to inspect the most recent batch of GGM Cases it

had produced.

139.    Upon inspection of the most recently produced GGM Cases, Miss Swiss notified LMT on February 11, 2021, of additional findings of defects in substantial numbers of GGM Cases.

140.    Miss Swiss again told LMT that the cases it was producing contained plastic pieces that were not correctly manufactured in accordance with the Approved Sample, that the cases were not correctly tightened, and that unless the case was properly manufactured and assembled, it cannot be sold.

141.    Miss Swiss again stated that the cases LMT was producing were not in conformance with the Approved Sample.

142.    Notwithstanding the fact that practically every case produced by LMT was not properly tightened, an inspection of an additional 1,000 cases by Miss Swiss revealed additional, and significant, assembly mistakes. By way of example only, 40 cases were specifically documented by Miss Swiss Cases as being defective for no color stickers, missing mirrors, the bottom frame component being unattached from the side frame components, side frame components assembled upside down, mirrors installed incorrectly, large scratches in the plastic, and/or missing hinge pins.

143.    Miss Swiss inspected these GGM Cases at its own expense.

144.    In response, LMT apologized for its issues with assembly of the GGM Cases and stated that their assembly process had gone through multiple "iterations with changes to operator steps and changes to where items are placed on the assembly line to reduce human error". *See* February 11, 2021 Email from Richard Himmelreich, attached hereto as Exhibit E.

145.    On February 16, 2021, LMT again implemented changes to its assembly protocols to address the issues raised by Miss Swiss. Specifically, LMT represented it was going to employ "a more diligent inspection process." to catch its assembly errors. *See* February 16, 2021 Email from Bernie Henry, attached hereto as Exhibit F.

146.    LMT also stated that as of February 16, 2021, there were 2,400 blue GGM Cases remaining

to be manufactured and assembled to complete the Purchase Order, minus other colors LMT refused to complete, and that these 2,400 blue cases would not be molded until after the mold changes and assembly protocols were corrected.

147.    On February 17, 2021, Miss Swiss picked up an additional batch of 696 GGM Cases (108 pink and 588 blue). *See* February 17, 2021 Invoice, attached hereto as Exhibit G.

148.    On March 9, 2021, Miss Swiss picked up an additional batch of 3,876 GGMCases (3,420 pink and 456 purple). *See* March 9, 2021 Invoice, attached hereto as Exhibit H.

149.    On March 22, 2021, Miss Swiss picked up an additional batch of 2,928 GGM Cases (732 blue and 2,196 purple). *See* March 22, 2021 Invoice, attached hereto as Exhibit I.

150.    On April 1, 2021, Miss Swiss picked up an additional batch of 2,536 GGM Cases (1,368 black and 1,168 blue). *See* April 1, 2021 Invoice, attached hereto as Exhibit J.

151.    On April 19, 2021, Miss Swiss picked up an additional batch of 2,652 black GGMCases. *See* April 19, 2021 Invoice, attached hereto as Exhibit K.

152.    In each of these pickups, Miss Swiss discovered a substantial number of GGM Cases that were defective and were not in conformance with the Approved Sample, including practically all cases being incorrectly tightened.

153.    All of the defects in the GGM Cases manufactured and assembled by LMT, stem from the fact that the GGM cases produced by LMT in the United States were not manufactured and assembled in conformance with, and did not function like, the Approved Sample manufactured in China. For instance, the makeup holders on the Approved Sample could be locked into place such that when one holder was lifted, the other three holders would remain in place. The GGM cases produced by LMT in the United States did not lock in this fashion due to the injection molds produced by LMT.

154.    Indeed, one of the design and patented values of the GGM Case is the case's ability to have makeup holders that lock into place in both the open and closed position.

23

155.    Despite LMT's numerous representations and promises to Miss Swiss that it could and would make the appropriate changes to its protocols, the GGM Cases manufactured and assembled by LMT were consistently produced with defects and out of conformance with the Approved Sample.

156.    LMT manufactured defective plastic pieces, using defective molds (that LMT itself created), and as a result produced GGM Cases with the defects described above. LMT did not manufacture a single GGM Case with plastic pieces that matched the Approved Sample.

157.    Each and every modification made by LMT to the injection molds and its manufacturing protocols was the result of LMT's attempts to rectify inconsistencies with the cases it was producing in its New Jersey facility compared with the Approved Sample, made at the Chinese facility, and to remediate its own manufacturing defects. None of which is the result of any conduct or design by Miss Swiss. Had LMT's injection molds and manufacturing protocols produced plastic pieces that conformed to the Approved Sample in the first place, none of its numerous modifications would have been necessary.

158.    Each and every modification made by LMT to its assembly protocols were made as a result of its failure to consistently assemble and produce GGM Cases in conformance with the Approved Sample. As described above, these inconsistencies were extreme and ranged from missing mirrors and stickers to plastic frame components being assembled upside down to the plastic parts not even being connected and flush. None of these modifications were the result of any conduct or design by Miss Swiss, nor could they have been, as Miss Swiss paid LMT specifically to perform all assembly.

**LMT Covers the Cost of Further Modifications to the Molds**

159.    During the months of February, March and April 2021, LMT proposed further modifications to the Mold Drawings and its assembly protocols in an attempt to rectify its failures to produce quality GGM Cases.

160.    Miss Swiss ultimately agreed to the modifications proposed by LMT, including: (1) an LMT employee was to perform a single task only on the assembly line for GGM Cases, (2) the extension

of a detent (catch) on the makeup holders, (3) increasing the screw hole bossheight, (4) extending the front ribs on the front frame piece, and (5) increasing the hinge bump height.

161.    On March 24, 2021, LMT stated that it would cover the costs of these modifications "due to all of the product launch issues" and that the modification "should help reduce assembly difficulties." *See* March 24, 2021 Email from Richard Himmelreich, attached hereto as Exhibit L.

162.    On or around April 23, 2021, LMT stated it had completed its modifications to the Mold Drawings.

163.    Defendant LMT, however, did not permit Miss Swiss to approve the modifications to the Mold Drawings, nor did Miss Swiss give Defendant LMT its approval on said modifications.

164.    On or around May 14, 2021, LMT shipped GGM Cases to Miss Swiss produced using the updated (and-unapproved) Mold Drawings.

165.    After inspection of this shipment of GGM Cases, Miss Swiss promptly notified LMT on May 18, 2021, that there continued to be defects, such as: the makeup holders continuedto not swivel appropriately on their axis, as they now were too difficult to move in and out of the locked position.

166.    LMT further modified the Mold Drawings and GGM Molds in an attempt to address the issues raised by Miss Swiss. These modifications were completed by LMT on or around May 29, 2021.

167.    Soon thereafter, LMT resumed production of GGM Cases using the updatedinjection molds.

168.    However, LMT did not provide Miss Swiss with the updated Mold Drawings nor was Miss Swiss provided with sample cases produced using the updated GGM Molds for approval. LMT made the May 29, 2021 changes unilaterally and without the knowledge or consent of Miss Swiss.

169.    LMT produced the balance of the Purchase Order using Mold Drawings and GGM Molds that were not approved by Miss Swiss.

**LMT Fails to Meet its Obligations Under the Purchase Order and Increases its**

**Prices**

170.    On May 25, 2021, LMT represented to Miss Swiss that of the original 31,075 GGM Case Purchase Order, LMT had yet to produce 1,525 cases (1,332 blue, 104 yellow, 81 purple, and 8 pink).

171.    LMT was waiting on colorant to finish the 1,332 blue cases. After receipt of the blue colorant, LMT and Miss Swiss picked up 1,056 blue cases—leaving 276 blue cases remaining unproduced.

172.    In addition, LMT unilaterally determined, and without prior notice to Miss Swiss, to close out the balance of the remaining 3 colors (yellow, purple, and pink). LMT represented that it was not going to produce these 194 GGM Cases.

173.    LMT stated that it would not honor these 194 GGM Cases due to issues with colorant and that these colorants would only be restocked if Miss Swiss placed a new purchase order with LMT. None of these issues with colorant were caused by Miss Swiss.

174.    Notwithstanding its nearly nine-month delay in producing approximately 29,000 GGM Cases, most of which were defective, LMT further represented that its facilities could assemble 4,000 quality cases per week and indicated that a 50,000-case order would takeapproximately three and a half months to both manufacture and assemble. With these statements,LMT sought to induce Miss Swiss to enter into a second purchase order with it.

175.    LMT also stated that its pricing for both manufacturing and assembly had increased (nearly double) and that all future purchase orders (including an order to produce the 470 GGM Cases it failed to complete under the original Purchase Order), would be subject tosaid price increases.

176.    LMT's failures under the Purchase Order include, but are not limited to: ( 1 )  failing to manufacture, assemble, produce, and supply to Miss Swiss any GGM Case that was free of defects and salable to the public at the time of delivery— Miss Swiss was able to make salable approximately 2,232 GGM Cases, but only after a third-party company salvaged plastic pieces manufactured by LMT (from cases manufactured at various times) and reassembled the cases correctly (using recovered parts) and in such a

way that the case conformed with the Approved Sample; (2) failing to supply Miss Swiss with 31,075 GGM Cases as called for in the Purchase Order—LMT shorted Miss Swiss by 470 GGM Cases; (3) refusing to produce the 470 GGM Cases called for in the Purchase Order; and (4) supplying Miss Swiss with the incorrect colors of GGM Cases—the Purchase Order called for 8,515 black cases but LMT supplied and charged Miss Swiss for 8,618.

177.    As a result of LMT's failures to meets it legal and contractual obligations under the Purchase Order and breach of duties owed to Miss Swiss, Miss Swiss was unable to meet several contractual agreements with vendors and was further damaged as follows: (1) Miss Swiss was unable to meet contractual obligations with a third-party online seller of GGM Cases, costing Miss Swiss at least $30,000; (2) Miss Swiss was unable to meet its contractual obligations with a third-party crowd funder, costing Miss Swiss $10,000; (3) Miss Swiss developed an entire makeup line (at a cost of $19,710) specifically designed and marketed to fit in the GGM Case makeup holders which could not be sold together with the case; (4) Miss Swiss unnecessarily spent $92,000 on marketing and advertising for a product that was not able to be sold.

178.    Despite its failures to meet its obligations under the original Purchase Order and its breaches of duties owed to Miss Swiss, LMT solicited Miss Swiss for a second order for the 2021 holiday season on several occasions.

## COUNTS

### Count I: Breach of Contract (Purchase Order)

179.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

180.    On or about September 3, 2020, Plaintiff Miss Swiss and Defendant LMT entered into a binding contract whereby LMT was to manufacture, assemble, and supply to Miss Swiss 31,075 GGM Cases, at a cost of $134,224 to Miss Swiss. *See Exhibit A.*

181.    Miss Swiss has performed all of its obligations under the terms of the Purchase Order.

27

182.    Pursuant to Purchase Order, LMT was required to manufacture, assemble, and supply to Miss Swiss 31,075 GGM Cases. *See Exhibit A.*

183.    Defendant LMT materially breached the Purchase Order by, *inter alia*: (1) failing to manufacture, assemble, produce, and supply to Miss Swiss any GGM Case that was free of defects and salable to the public at the time of delivery— Miss Swiss was able to make salable approximately 2,232 GGM Cases, but only after a third-party company salvaged plastic pieces manufactured by LMT (from cases manufactured at various times) and reassembled the cases correctly (using recovered parts) and in such a way that the case conformed with the Approved Sample; (2) failing to supply Miss Swiss with 31,075 GGM Cases as called for in the Purchase Order—LMT shorted Miss Swiss by 470 GGM Cases; (3) refusing to produce the 470 GGM Cases called for in the Purchase Order; (4) supplying Miss Swiss with the incorrect colors of GGM Cases—the Purchase Order called for 8,515 black cases but LMT supplied and charged Miss Swiss for 8,618; and (5) unilaterally changing the terms of the Purchase Order to increase manufacturing and assembly costs to complete the 470 GGM Cases it failed to complete.

184.    As a result of LMT's failure to meet its contractual and legal obligations under the Purchase Order, Miss Swiss was damaged as follows: (1) Miss Swiss paid LMT $134,224 for defective GGM Cases that could not be sold to the public; (2) Miss Swiss gave LMT $46,951.52 worth of assembly parts and packaging material that was wasted by LMT; (3) Miss Swiss incurred costs in excess of $6,000 to reassemble 2,323 GGM Cases which could be sold after reassembly; and (4) due to increased manufacturing and assembly costs, Miss Swiss will incur additional charges remanufacture and replace the nearly 30,000 defective cases supplied by LMT.

185.    Moreover, LMT's production of defective and unsalable GGM Cases has further damaged Miss Swiss because Miss Swiss has been forced to  incur the charges of disposal of these defective cases. ABS plastic (which is the material the plastic components of GGM Cases are made from) can only be properly and environmentally disposed of if the case is completed disassembled. To disassemble the

28

defective units and prepare them for proper disposal, Miss Swiss will incur charges of $1.90-$2.30 per case and incur additional charges to dispose of the plastic and assembly parts of approximately $5,000.

186.     Additionally, as a result of LMT's failures to meets it legal and contractual obligations under the Purchase Order, Miss Swiss was unable to meet several contractual agreements with vendors and was further damaged as follows: (1) Miss Swiss is unable to meet contractual obligations with a third-party online seller of GGM Cases, costing Miss Swiss atleast $30,000; (2) Miss Swiss was unable to meet its contractual obligations with a third-party crowd funder, costing Miss Swiss $10,000; (3) Miss Swiss developed an entire makeup line (at a cost of $19,710) specifically designed and marketed to fit in the GGM Case makeup holders which could not be sold together with the case; and (4) Miss Swiss unnecessarily spent $92,000 on marketing and advertising for a product that was not able to be sold.

187.     Implied in the contracts between Plaintiff Miss Swiss and Defendant LMT is a duty of good faith and fair dealing, pursuant to which the parties to the contracts are precluded from taking any action which would contravene the spirit and intent of the contracts so as to deny the other party its justified expectations under the contracts.

188.     By its actions described above, Defendant LMT has further breached the duty of good faith and fair dealing implied in the contract.

189.     Defendant LMT's material breaches of the Purchase Order have caused Plaintiff Miss Swiss to suffer damages in excess of $300,000.

**WHEREFORE**, Plaintiff requests that judgment be entered in its favor and against Defendant LMT for compensatory damages in an amount in excess of $300,000, together with interest, attorneys' fees and cots and such other and further relief as the Court deems just and proper.

### Count II: Breach of Contract (GGM Case Injection Molds)

190.     Plaintiff repeats and realleges the allegations above as though fully set forth herein.

191.     On or about June 17, 2020, Plaintiff Miss Swiss and Defendant LMT entered into a binding

contract whereby LMT was to manufacture and supply to Miss Swiss two GGM Molds at a cost of $42,000 to Miss Swiss. *See* Exhibit B.

192.   Miss Swiss has performed all of its obligations under the terms of the June 17, 2020 Agreement.

193.   Pursuant to the June 17, 2020, Agreement LMT was required to manufacture two GGM Molds (with the Mold Drawings) and supply them to Miss Swiss within 12- 14 weeks (9-11 with expedited delivery) of the date LMT received payment from Miss Swiss.

194.   Miss Swiss sent the $42,000 payment to LMT on June 17, 2020.

195.   Miss Swiss further paid LMT $14,500 in expedited delivery charges and airshipment charges to reduce the time to deliver the completed GGM Molds down to 9-11 weeks from June 17, 2020.

196.   Defendant LMT materially breached the June 17, 2020 agreement by, *inter alia*: (1) failing to produce and supply Miss Swiss with two GGM Molds within 9-11 weeks of June 17, 2020; (2) failing to supply Miss Swiss two GGM Molds that consistently produced GGM Cases that were of sound quality and salable; and (3) causing Miss Swiss to incur $10,500 in additional delivery and shipping charges that were neither necessary nor honored by Defendant LMT.

197.   As a result of LMT's failures to meet it legal and contractual obligations, Miss Swiss was unable to take advantage of 2020 holiday season sales, was unable to have a salable product until well into 2021 (and even then, very few cases were salable), and caused Miss Swiss to incur charges that were not necessary.

198.   Defendant LMT's material breaches of the June 17, 2020, Agreement have caused Plaintiff Miss Swiss to suffer damages in excess of $100,000.

199.   Implied in the contracts between Plaintiff Miss Swiss and Defendant LMT is a duty of good faith and fair dealing, pursuant to which the parties to the contracts are precluded from taking any action which would contravene the spirit and intent of the contracts so as to deny the other party its justified

expectations under the contracts.

200.    By its actions described above, Defendant LMT has breached the duty of good faith and fair dealing implied in the contract.

**WHEREFORE**, Plaintiff requests that judgment be entered in its favor and against Defendant LMT for compensatory damages in an amount in excess of $100,000, together with interest, attorneys' fees and cots and such other and further relief as the Court deems just and proper.

### Count III: Breach of Implied Warranty of Merchantability

201.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

202.    Defendant LMT is in the business of designing, manufacturing, assembling, and supplying plastic goods produced from injection molds.

203.    The warranty that goods are reasonably fit for the general purpose for which they are sold is implied by law in a contract for their sale if the seller is a merchant with respect to that kind of good.

204.    Defendant LMT is a merchant with respect to the manufacturing, assembly, and sale of commercial plastic products.

205.    Defendant LMT is a merchant with respect to the design, production, and sale of plastic injection molds.

206.    The overwhelming majority of GGM Cases manufactured, assembled, supplied, and sold by Defendant LMT are not reasonably fit for the general purpose for which they are intended and sold.

207.    The GGM Case injection molds produced and sold by LMT are not reasonably fit for the general purpose for which they are intended and sold.

208.    Defendant LMT has breached the implied warranty of merchantability by selling to Plaintiff GGM Cases that are not reasonably fit for the general purpose for which the cases are intended for.

209.    By their actions described above, Defendant LMT has breached its implied warranties. Plaintiff entered into the Purchase Order and engaged LMT to produce its GGM Cases in reasonable reliance

31

on Defendant LMT's warranties and representations, and Miss Swiss, reasonably believing and relying upon the GGM Cases to be as warranted by LMT, paid LMT $134,224 for 31,075 GGM Cases.

210.     All but 2,323 GGM Cases sold and supplied by LMT were valueless, as they cannot be used for their intended purpose. And the 2,323 salable cases had defects and issues remedied by Miss Swiss (and its third-party contractors), not by any effort made by LMT.

211.     Defendant LMT has breached the implied warrant of merchantability by selling to Plaintiff GGM Molds that are not reasonably fit for the general purpose for which the molds are intended for.

212.     The two GGM Molds produced and sold by Defendant LMT are virtually valueless, as they do not produce quality and salable GGM Cases consistently, and therefore the molds cannot be used for their intended purpose.

213.     As a direct and proximate result of the breaches by Defendant LMT,  Plaintiff Miss Swiss has been damages in an amount in excess of $175,00.

**WHEREFORE**, Plaintiff Miss Swiss requests that judgment be entered in its favor and against Defendant LMT for compensatory damages in an amount in excess of $175,000, together with interest, attorneys' fees and cots and such other and further relief as the Court deems just and proper.

### Count IV: Breach of Implied Warranty of Fitness for a Particular Purpose

214.     Plaintiff repeats and realleges the allegations above as though fully set forth herein.

215.     At the time of contracting Defendant LMT: (1) knew of the particular purpose for which Plaintiff sought for its GGM Cases and for which Plaintiff entered into the PurchaseOrder; and (2) knew that Plaintiff was relying on Defendant LMT's, experience, judgment, and expertise in selecting and furnishing suitable designs for the GGM Cases as well as the appropriate manufacturing and assembly protocols for LMT to produce quality and salable GGMCases that perform in accordance with their intended purpose.

216.     As detailed above, LMT was aware at the time of contracting of the particular purpose of

Miss Swiss' GGM Case and the specific use that was intended for consumers.

217.    The GGM Cases manufactured, assembled, and sold by Defendant LMT failed to perform as warranted. And the GGM Cases failed to perform in accordance with their intended purpose.

218.    By their actions described above, Defendant LMT has breached its implied warranties. Plaintiff entered into the Purchase Order with LMT and paid LMT $42,000 for two GGM Molds in reasonable reliance on Defendant LMT's warranties and representations, and Plaintiff, reasonably believing and relying upon the GGM Cases and Molds to be as warranted by LMT, paid it in excess of $175,000.

219.    The GGM Cases manufactured, assembled, and sold by LMT were valueless, asthey cannot be used for its intended purpose.

220.    The GGM Molds manufactured and sold by LMT were valueless, as they cannot be used for their intended and particular purpose.

221.    As a direct and proximate result of the breaches by Defendant LMT, Plaintiff Miss Swiss has been damaged in an amount in excess of $175,000.

**WHEREFORE**, Plaintiff Miss Swiss requests that judgment be entered in its favor and against Defendant LMT for compensatory damages in an amount in excess of $175,000, togetherwith interest, attorneys' fees and cots and such other and further relief as the Court deems justand proper.

### Count V: Intentional Misrepresentation

222.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

223.    Defendant LMT made intentional misrepresentations of fact which they knew to be untrue related to the manufacturing, assembly, and/or sale of both the 31,075 GGM Cases called for in the Purchase Order and the two GGM Molds.

224.    Defendant LMT made numerous misrepresentations as to its ability to manufacture, produce and assemble the GGM Cases in accordance with the Approved Sample and their intended purpose.

225.    Defendant LMT made intentional misrepresentations of fact when its representatives,

Richard Himmelreich and Bernie Henry, represented to Plaintiff that, *inter alia*,: (1) LMT could deliver the two GGM Molds within 12-14 weeks upon receipt of funds; (2) LMT could further expedite the shipping of the Molds, and have them delivered to its New Jersey facility no later than November 20, 2020, if Miss Swiss paid LMT an additional $10,500 for air shipment; (3) that as of November 6, 2020, LMT's New Jersey facility was ready and able to being manufacturing and assembling GGM Cases at scale; (4) LMT would have a large batch of pink GGM Cases completed and available for pickup by Miss Swiss on or before December 4, 2020; (5) after significant issues and defects in assembly, LMT was employing "a more diligent inspection process"; and (6) in an effort to induce Plaintiff to enter into a second purchase order, LMT stated it could properly produce 5,000 GGM Cases per week and that LMT would need only 3.5 months to complete an order of 50,000 cases.

226. Messrs. Himmelreich and Henry's statements are false because: (1) LMT was not able to deliver the two GGM case injection molds within 12-14 weeks of receipt of funds; (2) Miss Swiss's payment of $4,000 to expedite shipment by 2-3 weeks had no effect on delivery date; (3) LMT did not and could not deliver the molds by November 20, 2020, even with Miss Swiss paying $10,500 for air shipment; (4) LMT's New Jersey facility was not ready on November 6, 2020 to begin the manufacture and assembly of GGM Cases; (5) LMT did not employ a more diligent inspection process; and (6) LMT was unable to properly produce 5,000 GGM Cases per week and could not complete a 50,000 case order properly in 3.5 months (it tookLMT over six months to produce approximately 30,000 cases (which were defective) in connection with the Purchase Order).

227. Messrs. Himmelreich and Henry, on behalf of Defendant LMT, expressed such representations with knowledge that others, including Plaintiff, were expected to, and would, reply on said representations.

228. Furthermore, as detailed above, Defendant made numerous intentional misrepresentations, and sought to deceive Plaintiff into continuing its business relationship, to cover-up and disguise its

inabilities to perform its obligations to Miss Swiss.

229.    Plaintiff did not know that the representations made by Mr. Himmelreich and Mr. Henry were false and believed them to be true.

230.    Plaintiff actually and justifiably relied on said representations by Mr. Himmelreich and Mr. Henry to its detriment.

231.    As a direct and proximate result of the misrepresentations of Defendant LMT, Plaintiff has suffered damages in an amount in excess of $175,000 to be proven at trial.

**WHEREFORE**, Plaintiff Miss Swiss requests that judgment be entered in its favor and against Defendant LMT for compensatory damages in an amount to be proven at trial, together with interest, attorneys' fees and cots and such other and further relief as the Court deems just and proper.

## Count VI: Negligent Misrepresentation

232.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

233.    When Defendant LMT made the representations of fact related to the manufacturing, assembly and sale of the GGM Cases and GGM Case injection molds, it did so negligently, without any adequate basis for such representations.

234.    Defendant LMT made numerous misrepresentations as to its ability to manufacture, produce and assemble the GGM Cases in accordance with the Approved Sample and their intended purpose.

235.    Defendant LMT made intentional misrepresentations of fact when its representatives, Richard Himmelreich and Bernie Henry, represented to Plaintiff that, *inter alia*,: (1) LMT could deliver the two GGM Molds within 12-14 weeks upon receipt of funds; (2) LMT could further expedite the shipping of the Molds, and have them delivered to its New Jersey facility no later than November 20, 2020, if Miss Swiss paid LMT an additional $10,500 for air shipment; (3) that as of November 6, 2020, LMT's New Jersey facility was ready and able to being manufacturing and assembling GGM Cases at scale; (4) LMT would have a large batch of pink GGM Cases completed and available for pickup by Miss Swiss on or before

December 4, 2020; (5) after significant issues and defects in assembly, LMT was employing "a more diligent inspection process"; and (6) in an effort to induce Plaintiff to enter into a second purchase order, LMT stated it could properly produce 5,000 GGM Cases per week and that LMT would need only 3.5 months to complete an order of 50,000 cases.

236.     Messrs. Himmelreich and Henry's statements are false because: (1) LMT was not able to deliver the two GGM case injection molds within 12-14 weeks of receipt of funds; (2) Miss Swiss's payment of $4,000 to expedite shipment by 2-3 weeks had no effect on delivery date; (3) LMT did not and could not deliver the molds by November 20, 2020, even with Miss Swiss paying $10,500 for air shipment; (4) LMT's New Jersey facility was not ready on November 6, 2020 to begin the manufacture and assembly of GGM Cases; (5) LMT did not employ a more diligent inspection process; and (6) LMT was unable to properly produce 5,000 GGM Cases per week and could not complete a 50,000 case order properly in 3.5 months (it tookLMT over six months to produce approximately 30,000 cases (which were defective) in connection with the Purchase Order).

237.     Defendant LMT expressed such representations with knowledge that others, including Plaintiff, were expected to, and would, rely on said representations.

238.     Plaintiff did not know that the representations made by Defendant were false and believed they were true. Plaintiffs actually and justifiably relief on said representations to its detriment.

239.     As a direct and proximate result of the misrepresentations of the DefendantPlaintiff has suffered damages in an amount in excess of $175,000 to be proven at trial.

**WHEREFORE**, Plaintiff Miss Swiss requests that judgment be entered in its favor and against Defendant LMT for compensatory damages in an amount to be proven at trial, together with interest, attorneys' fees and cots and such other and further relief as the Court deems justand proper.

### Count VII: Conversion

240.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

36

241.     As more thoroughly described in the foregoing Complaint, Plaintiff owns the Mold Drawings.

242.     In connection Miss Swiss's July 17, 2020, $42,000 payment to LMT, Miss Swiss specifically paid for the production of the Mold Drawings.

243.     It can be shown by clear and convincing evidence that the Mold Drawings are the property of Plaintiff Miss Swiss.

244.     On September 3, 2021, Plaintiff, though its counsel, demanded that Defendant return possession of the Mold Drawings to Miss Swiss.

245.     To date, Defendant has refused to supply Plaintiff with possession of the Mold Drawings.

246.     Defendant has retained possession of Plaintiff's property, and have refused demands to release, among other things, the Molds Drawings.

**WHEREFORE**, Plaintiff Miss Swiss requests that judgment be entered in its favor and against Defendant LMT for compensatory damages in an amount in excess of $42,000, together with interest, attorneys' fees and cots and such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff, by and through her undersigned counsel, hereby demand a trial by jury on all matters so triable.

Respectfully submitted,

**JACOBS LAW GROUP, PC**

Dated: January 12, 2022

By: *Joseph M. Profy*
Neal A. Jacobs, Esq.
Joseph M. Profy, Esq.
Conor R. McCabe, Esq
One Logan Square
130 N. 18th Street, Suite 1200
Philadelphia, PA  19103
(215) 569-9701
(215) 569-9788
*Attorneys for Plaintiff*

38